**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**at COVINGTON**

**CRIMINAL CASE NO. 22-51-DLB-CJS**

**UNITED STATES OF AMERICA**                                              **PLAINTIFF**

**vs.**                    **REPORT AND RECOMMENDATION**

**ANTHONY MARIO WYNN**                                                   **DEFENDANT**

\* \* \*   \* \* \*   \* \* \*   \* \* \*

Before the Court is the Motion to Suppress filed by Defendant Anthony Wynn ("Wynn"). (R. 34). The United States filed a Response. (R. 38). At the conclusion of an evidentiary hearing on the Motion, the Court granted Wynn's unopposed oral motion to file a post-hearing brief and permitted the Government to file a responsive brief. (*See* R. 57; R. 60). The parties having filed their respective post-hearing briefs (*see* R. 71; R. 72), the matter is ripe for consideration and the preparation of a Report and Recommendation.[1] *See* 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, it will be recommended that the Motion to Suppress be **denied.**

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The factual circumstances presented here are taken from the transcripts of testimony from the evidentiary hearing (*see* R. 63; R. 64), as well as the dashboard and body-worn camera footage of the officers involved in the traffic stop at issue (*see* R. 58, Government's Exs. 2, 3, and 4; R. 61, Government's Ex. 1).[2]

---

[1] *See United States v. Quinney*, 238 F. App'x 150, 152 (6th Cir. 2007) (citing *United States v. Curtis*, 237 F.3d 598, 603 (6th Cir. 2001) (characterizing a motion to suppress as dispositive)).

[2] While each officer was outfitted with a body-worn camera, only one of the police cruisers was fitted with a dashboard camera. (*See* R. 63 at Page ID 249-50). For ease of reference, the dashboard camera

On August 28, 2020, shortly after 3:00 a.m., while on uniformed patrol in a marked police cruiser, Covington, Kentucky, Police Officer Bradley Morris initiated a traffic stop in the south end of Covington. (*See* R. 64 at Page ID 317-18). Officer Morris observed a car with no license plate illuminated, followed the vehicle, and ran the temporary tag that was taped to the top-left corner of the rear window. (*See id*. at Page ID 317; *see also* Morris Bodycam at 03:04:35). While Officer Morris was running the temporary tag, the vehicle made a right turn onto Howard Litzler Drive, turning onto the right shoulder rather than into the lane of traffic. (*See* R. 64 at Page ID 317-18). After the vehicle turned, it continued driving down the shoulder and did not correct course. (*See id*. at Page ID 318). Officer Morris activated his emergency equipment and initiated a traffic stop. (*See id*.).

The driver, later determined to be Defendant Wynn, was the only person in the vehicle. (*See id*. at Page ID 322; *see also* R. 63 at Page ID 252). Officer Morris testified that upon approaching the vehicle, he noticed the smell of marijuana. (*See* R. 64 at Page ID 319). Officer Morris further testified that he was familiar with the odor of marijuana based on his prior experiences. (*See id*. at Page ID 320). Officer Morris suspected Wynn was driving under the influence and contacted Covington Police Officer Douglas Ullrich, who specializes in narcotics and DUI investigations. (*See id*. at Page ID 319-20). It is unclear when exactly Officer Morris contacted Officer Ullrich, as the audio for Officer Morris's bodycam does not begin until approximately seven seconds after Officer Morris interacts with Wynn and no request can be heard thereafter. (*See* Morris Bodycam at 03:03:37-03:03:47).

---

footage will be referred to as "Dashcam" and the body-worn camera footage will be referred to by the last name of the corresponding officer (*e.g.*, "Morris Bodycam"). In addition, the timestamps in the bodycam footage are displayed in Zulu time, approximately four hours ahead of the local time in Kentucky. (*See R.* 63 at Page ID 269; R. 64 at Page ID 322). For ease of understanding, the timestamps referenced in this Report and Recommendation will be in local time.

After making contact with Wynn, Officer Morris collected Wynn's license and registration and examined the temporary tag which "appeared to be altered." (R. 64 at Page ID 323; *see* Morris Bodycam at 03:04:20-03:04:40). When Officer Morris asked why the temporary tag was altered, Wynn responded, "That's the driver's license, sir." (*See* Morris Bodycam at 03:04:40-03:04:55). When asked if he knew what a temporary tag was, Wynn replied, "It's my brother's car, I don't know." (*See id*. at 03:04:55-03:05:00). Officer Morris asked Wynn a second time whether he knew what a temporary tag was. (*See id*. at 03:05:00-03:05:05). Wynn responded, "Oh, the uh, [inaudible]" and pointed to the tag taped to the rear windshield, to which Officer Morris replied, "The one in the window, yeah." (*See id*.). Officer Morris testified that Wynn's responses made him "more concerned" about his sobriety because Wynn was not "able to follow the line of questioning exactly." (R. 64 at Page ID 323).

Officer Ullrich and Covington Police Officer Daniel Elsbernd arrived at the scene at approximately 3:05 a.m., just as Officer Morris finished asking Wynn about the temporary tag. (*See* Ullrich Bodycam, Elsbernd Bodycam, and Morris Bodycam at 03:05:00).[3] The officers met at the rear of the stopped vehicle where Officer Morris told Officer Ullrich that he could smell marijuana from the vehicle. (*See* Morris Bodycam at 03:05:05-03:05:20). Officer Morris also explained to Officer Ullrich that Wynn turned into the emergency shoulder and did not correct course and asked Officer Ullrich to speak with Wynn. (*See* Morris Bodycam at 03:05:20-03:05:40). Officer Morris then returned to his police cruiser in order to run Wynn's information through a police database. (*See id*.; *see also* R. 64 at Page ID 323).

---

[3] A fourth individual, Officer Goshorn, was riding with Officer Ullrich as a recruit prior to his admittance to the police academy. (*See* R. 63 at Page ID 288-89). Officer Goshorn took no substantive part in the encounter.

While Officer Morris proceeded to his cruiser, Officer Ullrich "made contact with Mr. Wynn with the intention of conducting the beginning of a possible DUI investigation" due to Officer Morris's concern about Wynn being under the influence. (R. 63 at Page ID 251; *see* Ullrich Bodycam at 03:05:38). Officer Ullrich approached the driver-side window and informed Wynn that he was going to talk to him to see if he was okay to drive. (*See* Ullrich Bodycam 03:05:40-03:05:44). Officer Ullrich testified that as soon as he made it to the window, he "could smell marijuana emanating from the interior of the car" and that he was very familiar with that scent. (R. 63 at Page ID 252). Officer Ullrich further testified that based on his training and experience, "drugs are very closely associated with weapons and specifically firearms"; thus, there is "an elevated concern for weapons" whenever "a traditional traffic stop" transitions "into a potential drug investigation." (*Id.*). Officer Ullrich clarified that "it was unclear" whether the odor was "generated from [Wynn's] person or the interior of the car." (*Id.*).

Wynn indicated that he was trying to get to "his baby's mama's house," but that he did not know how to get there. (*See* Ullrich Bodycam at 03:05:45-03:06:09). Wynn also informed that because he did not know how to spell the street name, he was unable to type the location into his GPS. (*See id.* at 03:06:09-03:06:20). When Officer Ullrich asked whether Wynn realized he was driving on the shoulder, Wynn responded that he was going to pull over at the turn because he did not know where he was going. (*See id.* at 03:06:20-03:06:30). When Officer Ullrich asked Wynn if he had been drinking that night, Wynn denied having drank that night and indicated that he was coming from Cincinnati and was "just trying to get home." (*See id.* at 03:06:55-03:07:18). After specifying where in Cincinnati he was coming from, Wynn further indicated that he "gave somebody a ride" and that he "was coming over here, somebody just gave [him] twenty bucks to give them a ride." (*See id.* at 03:07:18-03:07:32). Officer Ullrich then requested Wynn to place

the things in his lap onto the passenger seat and asked Wynn if he "carried a gun, a knife, anything like that?" (*See id*. at 03:07:33-03:07:48). Wynn responded, "No, sir, this is not my car." (*See id*. at 03:07:48-03:07:50). Officer Ullrich clarified that the question was directed at Wynn's person, and Wynn responded, "No, sir." (*See id*. at 03:07:50-03:07:58).

Officer Ullrich testified that Wynn appeared "extremely nervous" and that Wynn's responses to his questions were "a little concerning." (R. 63 at Page ID 252). Specifically, Officer Ullrich testified that Wynn's travel plans—that he was going to his child's mother's house, had given someone a ride, and was going home—were not "reasonable or logical." (*Id*. at Page ID 271). He further testified as follows:

> Mr. Wynn was explaining, if I recall correctly, that he was going up to Promontory Drive, which is an apartment complex near the area he was stopped, to visit, I believe, his girlfriend or another person he knew, which he kind of indicated that he had been to before, but that he also didn't know where it was, which was just a little – didn't line up quite right and it was concerning to me that he may be fabricating that.

(*Id*. at Page ID 253-54). In addition, Officer Ullrich testified that he was concerned when he asked Wynn about weapons and received the response, "No, sir, this is not my car," because "[t]hat kind of a response of [Wynn] distancing himself from the car can indicate . . . that he is trying to verbally put himself further and further away from whatever it is in the car." (*Id*. at Page ID 271-72). Officer Ullrich testified that Wynn "was pretty animated in the car" and "was moving around a fair amount" which drew his attention and raised his concerns about the possibility of a weapon. (*Id*. at Page ID 254).

Officer Ullrich directed Wynn to step out, turn around, and place his hands on top of the car. (*See id*.; *see also* Ullrich Bodycam at 03:08:09-03:08:14). Wynn asked Officer Ullrich to tell him why he had to step out of the vehicle, contending that he had done nothing wrong. (*See* Ullrich Bodycam at 03:08:12-03:08:20). After explaining that Wynn was driving on the shoulder, Officer

Ullrich opened the driver-side door and directed Wynn to step out and place his hands on top of the vehicle. (*See id*. at 03:08:20-03:08:30). Officer Ullrich testified that Wynn's reluctance to exit the vehicle heightened his concern that there might be a weapon in the vehicle or that Wynn might "put [the vehicle] in drive and potentially flee or run someone over." (R. 63 at Page ID 254-55). Wynn stepped out of the vehicle and asserted that he had the right to remain in the car, contending again that he had done nothing wrong. (*See* Ullrich Bodycam at 03:08:30-03:08:35). Officer Ullrich clarified that Wynn did not have such a right and directed Wynn to turn and place his hands on top of the car. (*See id*.). Wynn turned to face the car, at which point Officer Ullrich grabbed ahold of Wynn, pressed him against the vehicle, and placed him in handcuffs. (*See id*. at 03:08:35-03:08:44).

Officer Ullrich testified that although Wynn exited the vehicle and turned around, he did not put his hands on the vehicle and, instead, "reached down towards his right hip." (R. 63 at Page ID 255-56). Officer Ullrich clarified that "one of the most concerning areas on a person who hasn't been patted down" is their waistband because "that's where most people carry most of their weapons." (*Id*.). Officer Ullrich further testified that he "grabbed ahold of Wynn to prevent him from retrieving whatever he was reaching for," at which point he "could feel [Wynn's] entire body tense up and become rigid." (*Id*. at Page ID 256). Officer Ullrich also clarified that "[a]t that point, not being sure what [Wynn] was reaching for, or what [Wynn] was intending on doing, [he] secured [Wynn] in handcuffs for safety reasons." (*Id*.).

Officer Ullrich began conducting a pat down of Wynn's person. (*See* Ullrich Bodycam at 03:09:00). Officer Ullrich testified that while running a flat hand on the exterior of Wynn's clothes along his right leg and right pants pocket, he felt a "foreign object" that he "believed was obviously marijuana." (R. 63 at Page ID 257; *see also* Ullrich Bodycam at 03:09:10-03:09:25). Officer

Ullrich clarified that he could tell the object was "an organic, leafy kind of material . . . shaped in kind of a spherical mound which is very common when . . . bagging up marijuana in small amounts." (R. 63 at Page ID 257). While Officer Ullrich was patting Wynn down near his right pants pocket, Wynn stated, "That ain't nothing but money [inaudible]." (*See* Ullrich Bodycam at 03:09:25-03:09:32). Officer Ullrich responded, "That's not money," to which Wynn replied, "[inaudible] bag of weed, I'm sorry." (*See id*.). When Officer Ullrich pulled the object out of Wynn's pocket, Wynn stated, "That's it." (*See id*. at 03:09:30-03:09:36; *see also* R. 63 at Page ID 259, 272-73). Officer Ullrich testified that Wynn was going to be arrested based on finding the marijuana on his person and given his behavior. (*See* R. 63 at Page ID 274-75).

Around this time, Officer Morris rejoined the officers after having completed his check of Wynn's information. (*See* Morris Bodycam at 03:08:25-03:08:40; R. 64 at Page ID 323-25). Officer Morris testified that his check of Wynn's information indicated that Wynn was "known for drug activity." (R. 64 at Page ID 324). Officer Morris informed Officer Ullrich that Wynn had "a drug alert out of Ohio" for being a "known drug user." (*See* Morris Bodycam at 03:09:58-03:10:30; *see also* R. 64 at Page ID 325; R. 63 at Page ID 273). Officer Ullrich testified that Wynn's "alert for being a known drug offender" raised his concerns. (*See* R. 63 at Page ID 257; *see also* Ullrich Bodycam at 03:10:05-03:10:15).

Officer Ullrich continued his pat down of Wynn, running his hand across the front of Wynn's waist. (*See* Ullrich Bodycam at 03:10:10-03:10:30). Officer Ullrich testified that as he came across the front of Wynn's waist, Wynn "pulled away and moved his hips in a manner" that Officer Ullrich associated with a person "trying to avoid [a] search of their front because they may have contraband in their front." (R. 63 at Page ID 259). Officer Ullrich further testified that based on his experience, it was "extremely common" to find drugs hidden in an individual's groin area

7

and that Wynn's reaction of pushing his front toward the car was consistent with the behavior of an individual concealing items in their underwear. (*Id*. at Page ID 260). Officer Ullrich directed Wynn to spread his feet apart and continued his pat down. (*See* Ullrich Bodycam at 03:10:30-03:10:40). Officer Ullrich testified, "Directly in the front of Mr. Wynn's groin there was something that was very obviously a foreign object. It wasn't marijuana, it was a little more firm than that, but it was definitely some kind of bag or container of stuff in the front of his underwear." (R. 63 at Page ID 260). Officer Ullrich further testified that based on his training and experience, it was immediately apparent that the foreign object was drugs. (*See id*. at Page ID 260-61).

Officer Ullrich directed Wynn to the front of the police cruiser in order to more fully capture on video the remainder of their interaction. (*See* Ullrich Bodycam and Dashcam at 03:10:40-03:10:50; R. 63 at Page ID 261-62). Officer Ullrich then proceeded to the back of his cruiser to retrieve gloves in order to search Wynn's person for the suspected drugs he felt. (*See* Ullrich Bodycam at 03:11:10-03:11:25; *see also* R. 63 at Page ID 262). While Officer Ullrich was retrieving his gloves, Officers Morris and Elsbernd stayed with Wynn. (*See* Morris Bodycam, Elsbernd Bodycam, and Dashcam at 03:11:10-03:11:17). Wynn started to walk back to his vehicle, asking, "Can I grab my phone please?" (*See* Morris Bodycam, Elsbernd Bodycam and Dashcam at 03:11:17-03:11:21). Officers Morris and Elsbernd grabbed ahold of Wynn, told him no, and placed him face-down on the hood of the cruiser. (*See id*. at 03:11:20-03:11:22). Wynn lifted himself from the hood of the cruiser and struggled with the officers, stating, "I just want my phone." (*See id*. at 03:11:22-03:11:25). Wynn continued to struggle with the officers and ask for his phone, at which point the officers pressed Wynn onto the hood of the cruiser, directing him to stay and to not get up. (*See id*. at 03:11:25-03:11:40). Officers Morris and Elsbernd testified that they prevented Wynn from walking back to his vehicle and pressed him against the hood of the

8

cruiser to get him under control and because they were concerned for his safety, for their safety, and for the potential for Wynn to destroy or discard the suspected evidence in his underwear. (R. 63 at Page ID 301-02; R. 64 at Page ID 325-27).

Officer Ullrich testified that while he was getting his gloves, he "heard some scuffling and some shouting at the front of [his] car and [he] came up to find Officer Elsbernd and Officer Morris who were with Mr. Wynn kind of just hemming and hawing, pushing and shoving as Mr. Wynn was trying to pull away from them." (R. 63 at Page ID 262-63). While Wynn was leaning with his back against the hood of the cruiser, Officer Ullrich attempted to remove the lanyard around Wynn's neck. (*See* Ullrich Bodycam at 03:12:00-03:12:15). In response to Officer Ullrich's efforts, Wynn jerked his head away and told Officer Ullrich that he did not have the right to remove the lanyard. (*See id*.). Officer Ullrich forcibly removed the lanyard by pulling it in a downward direction. (*See id*.). Officer Ullrich testified that the lanyard had keys on it and that he removed the lanyard in order to identify what was on it and because keys are potential weapons. (*See* R. 63 at Page ID 274).

After Officer Ullrich removed the lanyard, Wynn lifted himself off the cruiser and threw himself onto the hood of the vehicle. (*See* Dashcam and Ullrich Bodycam at 03:12:15-03:12:25). Officer Morris testified that as the officers were trying to hold Wynn against the vehicle, "[h]e started to resist and started to try to pull away from" the officers. (R. 64 at Page ID 327). Officer Elsbernd testified that Wynn "kicked off" the "bottom portion of the push bumper closest to the ground." (R. 63 at Page ID 301). Officer Ullrich testified that Wynn "climbed the push bumper on the front of [the] car and threw his body on the hood of [the] car denting [the] hood." (*Id*. at Page ID 263). Officers Elsbernd and Morris testified that after throwing himself against the hood

9

of the car, Wynn became "more agitated" and "belligerent," so they took Wynn to the ground to get him under control.  (R. 63 at Page ID 303; R. 64 at Page ID 328).

While on the ground, Wynn continued to struggle with the officers by kicking and crawling.  (*See* Ullrich Bodycam and Morris Bodycam at 03:12:30-03:13:30; *see also* R. 63 at Page ID 265-66; R. 64 at Page ID 328-29).  At one point, Wynn's head was directly under the guard rail; therefore, the officers pulled Wynn out from under the guard rail to prevent Wynn from getting injured and to gain better control.  (*See* Ullrich Bodycam, Morris Bodycam, Elsbernd Bodycam and Dashcam at 03:15:05-03:15:25; R. 63 at Page ID 266; R. 64 at Page ID 329).  Officer Ullrich explained to Wynn that the officers were going to search him, to which Wynn responded, "You're not searching me.  You're going to have to kill me."  (*See* Ullrich Bodycam at 03:16:00-03:16:30; *see also* R. 64 at Page ID 329).  Wynn continued to struggle while Officer Ullrich attempted to search his person.  (*See* Ullrich Bodycam, Morris Bodycam, and Elsbernd Bodycam at 03:16:30-03:22:30).  Officer Ullrich testified that Wynn was "exceptionally successful in preventing [the officers] from accessing the drugs in his underwear."  (R. 63 at Page ID 266).  Officer Ullrich further testified that the officers spent roughly "ten minutes trying to just get those drugs out of his underwear," at which point Officer Ullrich was concerned that Wynn's continued struggling would injure Wynn or the officers; thus, Officer Ullrich decided he would cut Wynn's underwear with paramedic shears.  (*Id*. at Page ID 267; *see also* Ullrich Bodycam at 03:21:50-03:22:40).

Officer Ullrich then cut Wynn's underwear and removed them from Wynn's person.  (*See* Ullrich Bodycam at 03:22:45-03:23:50; *see also* R. 63 at Page ID 267; R. 64 at Page ID 331).  Officer Ullrich clarified that Wynn's loose-fitting pants were lowered over the course of his continued struggle on the ground; thus, the officers did not have to remove his pants in order to

cut his underwear.  (*See* R. 63 at Page ID 267; *see also* R. 64 at Page ID 330).  Officer Ullrich recovered a large bag of suspected cocaine from within the front pass-through of Wynn's underwear.  (*See* R. 63 at Page ID 268; Ullrich Bodycam at 03:23:50-03:24:00).  After recovering the drugs from Wynn's underwear, the officers lifted Wynn to his feet and placed him in the back of Officer Ullrich's police cruiser.  (*See* Ullrich Bodycam, Morris Bodycam, Elsbernd Bodycam, and Dashcam at 03:25:00-03:26:08).  Once Wynn was secured in the back of Officer Ullrich's cruiser, Officer Ullrich took Wynn to the hospital and the jail, while Officer Morris began searching Wynn's vehicle back at the scene of the stop.  (*See* R. 63 at Page ID 276; Morris Bodycam at 03:30:18-03:31:05; R. 64 at Page ID 332).

As a result of the search of Wynn's vehicle, the officers seized two firearms and a cell phone.  Officer Morris discovered a firearm after unlocking the glove compartment using a key from the lanyard taken from Wynn's person.  (*See* Morris Bodycam at 03:31:35-03:32:00; R. 64 at Page ID 333).  Officers Morris and Elsbernd provided conflicting testimony as to who searched the trunk and how it was accessed.  (*Compare* R. 63 at Page ID 305-06 (Officer Elsbernd testifying that he searched the trunk and that he believed he opened the trunk by using the key from the Wynn's lanyard) *with* R. 64 at Page ID 345 (Officer Morris testifying that he searched the trunk and that he opened the trunk by using the trunk latch)).  Review of the bodycam footage demonstrates that Officer Elsbernd opened the trunk via the latch on the inside of the driver's door and seized a firearm from within a backpack in the trunk.  (*See* Elsbernd Bodycam at 03:49:20-03:51:15).  In addition, Officer Morris seized a cell phone and testified that pursuant to Covington Polce Department procedure, he placed the phone in "airplane mode" in order to preserve its current state.  (*See* R. 64 at Page ID 333-34, 337; *see also* R. 63 at Page ID 307-08).  Officer Morris further testified that he was involved in the follow-up investigation, executing two search warrants

in order to download the information contained in the seized cell phone.  (*See id*. at Page ID 335). Officer Morris clarified that he sought two search warrants because the first download appeared to be incomplete, as demonstrated by the output of the download.  (*See id*. at Page ID 335-36; *see also* R. 61, Government's Exs. 8 and 9).

On July 12, 2022, Wynn was charged federally by Criminal Complaint with one count of possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1), one count of possession of a firearm as a convicted felon in violation of 18 U.S.C. § 922(g)(1), and one count of possession of a firearm in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c). (*See* R. 1).  Wynn appeared for his Initial Appearance on July 28, 2022 (*see* R. 6) and was ordered detained pending a preliminary hearing (*see* R. 7).  At the conclusion of the July 26, 2022 preliminary hearing, the Court found probable cause to bind the matter over to a grand jury.  (*See* R. 9).  Wynn was ordered detained pretrial (*see* R. 11; *see also* R. 30) and on August 11, 2022, the federal grand jury at Covington returned an Indictment charging Wynn with the same three counts charged in the Criminal Complaint (*see* R. 13).  Also on August 11, the Government filed a Prior Conviction Notice pursuant to 21 U.S.C. § 851(a)(1).  (*See* R. 15).  On August 16, 2022, Wynn appeared for arraignment and pleaded not guilty to the charges in the Indictment.  (*See* R. 20).

On December 16, 2022, Wynn filed a Motion to Suppress Evidence obtained from the search of his person and vehicle.  (*See* R. 34).  The United States filed a Response (*see* R. 38) and the parties agreed that an evidentiary hearing was warranted (*see* R. 42).  At the March 16, 2023 evidentiary hearing, the Government presented testimony from Officers Ullrich and Elsbernd, with the parties agreeing to continue the evidentiary hearing in order to accommodate Officer Morris's schedule.  (*See* R. 57; R. 58; *see also* R. 63 at Page ID 243-45, 310-11).  At the conclusion of the April 3, 2023 continued evidentiary hearing, the Court granted Wynn's unopposed oral motion to

file a post-hearing brief and permitted the Government to file a responsive brief. (*See* R. 60). On July 7, 2023, Wynn filed his Post-Hearing Brief in Support (*see* R. 71) and on July 15, 2023, the United States filed its Post-Hearing Brief in Opposition (*see* R. 72). Thus, the matter is ripe for consideration.

## II.    ANALYSIS

Wynn seeks suppression of evidence on several grounds. (*See generally* R. 34; R. 71). In his Motion, Wynn argues that the initial stop was not supported by a warrant, that the officers prolonged the stop by removing Wynn from the vehicle, and that the officers lacked the authority to search the vehicle as a search incident to a lawful arrest. (*See* R. 34). In his post-hearing brief, Wynn argues that the search of his person was objectively unreasonable when the officers held him on the ground on the side of the road and cut off his underwear in order to retrieve contraband and that Officer Ullrich's testimony concerning the plain feel of the contraband during the pat down should be discredited. (*See* R. 71). Each argument will be addressed in turn.

> **A.    The initial stop did not violate the Fourth Amendment because Officer Morris had reasonable suspicion that Wynn was operating the vehicle under the influence or probable cause to believe that Wynn committed a civil traffic offense.**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . and effects against unreasonable searches and seizures." U.S. Const. amend. IV. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." *Whren v. United States*, 517 U.S. 806, 809-10 (1996). The general rule is that warrantless searches and seizures are *per se* unreasonable. *See Katz v. United States*, 389 U.S. 347, 357 (1967). However, "'practically since the beginning of the Government' officers have been allowed to stop a vehicle on public roads without a warrant when they have probable cause

to believe that the occupants have committed a crime." *United States v. Brooks*, 987 F.3d 593, 598 (6th Cir. 2021) (quoting *Carroll v. United States*, 267 U.S. 132, 153-56 (1925)). The Fourth Amendment also permits vehicle stops based on "mere 'reasonable suspicion' that a felony has occurred or that a misdemeanor is occurring." *Id*. (citing *United States v. Collazo*, 818 F.3d 247, 253-54 (6th Cir. 2016) and then *Arizona v. Johnson*, 555 U.S. 323, 330-31 (2009)). In addition, in the Sixth Circuit, an officer can stop a vehicle without a warrant if he has probable cause to believe that an occupant has committed only a *civil* traffic offense. *See United States v. Lyons*, 687 F.3d 754, 763 & n.3 (6th Cir. 2012) (citing *Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763, 771 n.6 (6th Cir. 2004)); *see also Whren*, 517 U.S. at 810 ("The decision to stop an automobile is reasonable when the police have probable cause to believe that a traffic violation has occurred.").

Under Kentucky law, "[a] person shall not operate or be in physical control of a motor vehicle anywhere in this state . . . while under the influence of alcohol . . . [or] any other substance or combination of substances which impairs one's driving ability." Ky. Rev. Stat. Ann. ("KRS") § 189A.010(1). A person's first, second, or third violation of this statute within a ten-year period is considered a misdemeanor, while the fourth violation is a felony. *See* KRS § 189A.010(5) (noting first, second, and third offenses are punishable by fine and/or imprisonment in county jail and fourth violation is "Class D felony"); KRS § 431.060 (defining misdemeanor as an offense "punishable by confinement other than in the penitentiary, whether or not a fine or other penalty may also be assessed"); *see also Commonwealth v. Moore*, 545 S.W.3d 848, 850-51 & n.3 (Ky. 2018). Thus, Officer Morris was permitted to initiate an investigative stop of the vehicle if he had reasonable suspicion that the driver was operating the vehicle under the influence. *See Gaddis*, 364 F.3d at 771 n.6 ("Police may make an investigative stop of a vehicle when they have reasonable suspicion of an ongoing crime, whether it be a felony or a misdemeanor, including

14

drunk driving in jurisdictions where that is a criminal offense."); *see also United States v. Fitzmaurice*, No. 3:22-CR-136-CHB, 2023 WL 3183313, at *8 (W.D. Ky. May 1, 2023) (noting that because driving under the influence is criminal activity, an officer initiating a stop for that purpose needs only reasonable suspicion, not probable cause).

In general, reasonable suspicion involves officers making "commonsense judgments and inferences about human behavior." *Kansas v. Glover*, 140 S. Ct. 1183, 1188 (2020) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)). Courts consider the totality of the circumstances when determining whether an officer has developed reasonable suspicion of criminal activity. *United States v. Stepp*, 680 F.3d 651, 664 (6th Cir. 2012) (citation omitted). The officer "must point to specific and articulable facts that are more than an ill-defined hunch." *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004) (internal quotations omitted). "Police officers are permitted to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Shank*, 543 F.3d 309, 315 (6th Cir. 2008); *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002). "[T]he likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Arvizu*, 534 U.S. at 274 (citations omitted).

Here, Officer Morris had reasonable suspicion to believe Wynn was operating the vehicle while under the influence. Officer Morris testified that he observed a vehicle make "a right-hand turn from 3-L onto Howard Litzler [Drive]." (R. 64 at Page ID 317). He further testified that during the turn, the vehicle "did not go into the lane of traffic," and, instead turned "into the emergency strip on the right-hand side of the road." (*Id.*). Officer Morris clarified that the vehicle did not correct course and "[c]ontinued driving down the emergency strip." (*Id.* at Page ID 318).

Under the circumstances, Officer Morris had reasonable suspicion that Wynn was operating the vehicle under the influence. *See Baker v. Commonwealth*, 475 S.W.3d 633, 635-36 (Ky. Ct. App. 2015) (finding car hugging fog line and weaving in its own lane is sufficient evidence on its own to create reasonable suspicion of drunk driving); *Davis v. Commonwealth*, 484 S.W.3d 288, 291 (Ky. 2016) (finding same for car swerving outside of lane); *Baker v. Paolucci*, No. 2:14-CV-91 (WOB-CJS), 2017 WL 2405369, at *2 (E.D. Ky. June 2, 2017); *see also Navarette v. California*, 572 U.S. 393, 402 (2014) (describing "driving in the median" as "sound indicia of drunk driving"); *c.f. United States v. Jabbi*, No. 5:18-62-KKC, 2018 WL 5306989, at *3 (E.D. Ky. Oct. 26, 2018) (finding officer had "probable cause" to believe defendant was "driving under the influence or driving carelessly" when he observed vehicle "swerve to the right and hit the rumble strip at least twice").

In addition, Officer Morris had probable cause to believe Wynn committed a civil traffic offense based on his observations. "Probable cause is a reasonable ground for belief supported by less than prima facie proof but more than mere suspicion." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) (citing *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006)). In determining whether an officer had probable cause to initiate a traffic stop, courts

> focus not on whether a reasonable officer "would" have stopped the suspect (even though he had probable cause to believe that a traffic violation had occurred), or whether any officer "could" have stopped the suspect (because a traffic violation had in fact occurred), but on whether this particular officer in fact had probable cause to believe that a traffic offense had occurred, regardless of whether this was the only basis or merely one basis for the stop.

*United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993).

Under Kentucky law, "[t]he operator of any vehicle upon a highway shall operate the vehicle in a careful manner, with regard for the safety and convenience of pedestrians and other vehicles upon the highway." KRS § 189.290(1). This provision covers what is commonly referred

to as "reckless driving." *United States v. Lopez*, 567 F.3d 755, 757 (6th Cir. 2009); *see Bishop v. Commonwealth*, No. 2017-CA-001793-MR, 2019 WL 103924, at *9 (Ky. Ct. App. Jan. 4, 2019) (referring to "reckless driving" under KRS § 189.290 as a "traffic violation[]" that is "defined outside the penal code and penalized by KRS [§] 189.990(1)," with a penalty of "not less than twenty ($20) dollars nor more than one hundred dollars ($100) for each offense"). The Kentucky Supreme Court has held that excessive speed or driving erratically constitute reckless driving in violation of KRS § 189.290(1). *See United States v. Scott*, 338 F. App'x 517, 518 (6th Cir. 2009) (citing *Stephens v. Commonwealth*, 356 S.W.2d 586, 587 (Ky. 1962) and then *Lockridge v. Mercer*, 438 S.W.2d 486, 487-88 (Ky. 1968)).

Here, Officer Morris testified that he observed Wynn turn onto the right shoulder on Howard Litzler Drive. (*See* R. 64 at Page ID 317-18). Officer Morris further testified that after turning, Wynn continued driving down the shoulder and did not correct course. (*See id.* at Page ID 318). Under these circumstances, Officer Morris had probable cause to believe Wynn committed the civil traffic offense of reckless driving. *See Hones v. Commonwealth*, No. 2013-CA-001423-DG, 2014 WL 6686794, at *2 (Ky. Ct. App. Nov. 26, 2014) (affirming district court's denial of motion to suppress because officer had probable cause to initiate traffic stop for reckless driving under KRS § 189.290 when officer observed vehicle "cross both the center line and the fog line of the road"); *see also Crigger v. McIntosh*, 254 F. Supp. 3d 891, 899 (E.D. Ky. 2017) (collecting cases finding traffic stop for reckless driving was supported by probable cause or reasonable suspicion when officer observed erratic driving, including speeding, crossing the center line, driving across the fog line, driving onto the rumble strip repeatedly, changing lanes without signaling, cutting off other cars, and weaving back and forth between lanes).[4]

---

[4] Of note, the Sixth Circuit has acknowledged that there is a "lingering uncertainty" as to whether it "continue[s] to require probable cause for a stop if officers believe that an occupant has committed only

Moreover, the Sixth Circuit has held that an officer has probable cause to stop a vehicle with an unilluminated temporary tag for an apparent violation of Kentucky law, even though no Kentucky statute or regulation specifically requires that temporary tags be illuminated at night. *See United States v. Foster*, 65 F. App'x 41, 44-45 (6th Cir. 2003); *see also* KRS § 186.170(1). Here, Officer Morris testified that shortly after 3:00 a.m., he "witnessed a car with no license plate illuminated." (R. 64 at Page ID 317). To be sure, Officer Morris testified that he ran the temporary tag, but his ability to read the tag does not necessarily mean it was illuminated. Indeed, review of the bodycam shows that it was not. (*See* Morris Bodycam at 03:04:35). Thus, on this record, Officer Morris also had probable cause to initiate a traffic stop for Wynn's failure to illuminate the temporary tag. *See Foster*, 65 F. App'x at 44-45.

In sum, because the stop was supported by reasonable suspicion that Wynn was driving under the influence or probable cause to believe that Wynn committed a civil traffic offense, no warrant was necessary; thus, Officer Morris did not violate the Fourth Amendment when he initiated the stop.

Wynn states in his Motion "[t]hat a person's appearance and conduct conformed to a 'profile' will not satisfy the government's burden of demonstrating the existence of reasonable

---

a *civil* traffic offense." *Brooks*, 987 F.3d at 589 (emphasis in original) (citing *United States v. Shelton*, 817 F. App'x 217, 219 & n.2 (6th Cir. 2020) and then *United States v. Taylor*, 471 F. App'x 499, 510-11 (6th Cir. 2012)); *see United States v. Stevenson*, 43 F.4th 641, 644-45 (6th Cir. 2022). Indeed, in addressing an officer's stop of a vehicle based solely on a belief that a faulty brake light violated North Carolina traffic law, the United States Supreme Court noted, "All parties agree that to justify this type of seizure, officers need only 'reasonable suspicion'—that is, 'a particularized and objective basis for suspecting the particular person stopped' of breaking the law." *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (quoting *Navarette*, 572 U.S. at 396). Moreover, the Eastern District of Kentucky has applied the reasonable-suspicion standard when evaluating a traffic stop for violation of Kentucky traffic law, including reckless driving in violation of KRS § 189.290. *See Crigger*, 254 F. Supp. 3d at 898-99 (citing *Heien*, 574 U.S. at 60). Here, the lack of clarity as to which standard applies when stopping a vehicle solely for a civil traffic offense does not make a difference, as Officer Morris had probable cause. *See Stevenson*, 43 F.4th at 645 (noting no need to address the question "because where an officer possesses probable cause, he necessarily possesses reasonable suspicion").

suspicion." (R. 34 at Page ID 162) (citing *United States v. Sokolow*, 490 U.S. 1 (1989)).  However,

the point of this statement in furthering Wynn's efforts to suppress evidence is unclear.  For

starters, that is not what the Supreme Court held in *Sokolow*.[5]  In any event, Officer Morris did not

rely on a "profile" in making his decision to initiate the stop; he stopped the vehicle because he

observed it turn onto the right shoulder and fail to correct course.  (*See* R. 64 at Page ID 317-18).

Thus, Wynn's concern that Officer Morris used a "profile" to support his decision to stop the

vehicle is unfounded.  Moreover, even if Officer Morris had pretextual motives for initiating the

stop, that would not change the Fourth Amendment analysis.  *See Whren*, 517 U.S. at 813; *Blair*,

524 F.3d at 748 ("When a traffic stop is supported by probable cause, an officer's subjective intent

is irrelevant."); *see also United States v. Palomino*, 100 F.3d 446, 449 (6th Cir. 1996) (finding that

where the officer observed the defendant speeding and changing lanes without signaling, "even if

[the officer] was motivated by a suspicion that the defendant fit into a drug courier profile, the stop

was not unreasonable because probable cause existed"); *United States v. Hill*, 195 F.3d 258, 265

(6th Cir. 1999).  Officer Morris did not violate the Fourth Amendment when he stopped the vehicle

based on Wynn's erratic driving.

---

[5] There, the Court found that Drug Enforcement Administration ("DEA") agents had reasonable suspicion to stop the respondent upon his arrival at Honolulu International Airport, based on the following factors:

> (1) he paid $2,100 for two airplane tickets from a roll of $20 bills; (2) he traveled under a name that did not match the name under which his telephone number was listed; (3) his original destination was Miami, a source city for illicit drugs; (4) he stayed in Miami for only 48 hours, even though a round-trip flight from Honolulu to Miami takes 20 hours; (5) he appeared nervous during his trip; and (6) he checked none of his luggage.

490 U.S. at 3.  In so finding, the Court rejected the respondent's argument that its analysis should change based on "the agents' belief that [the respondent's] behavior was consistent with one of the DEA's 'drug courier profiles.'"  490 U.S. at 10.  The Court noted that "[a] court sitting to determine the existence of reasonable suspicion must require the agent to articulate the factors leading to that conclusion, but *the fact that these factors may be set forth in a 'profile' does not somehow detract from their evidentiary significance* as seen by a trained agent."  *Id.* (emphasis added).

**B.    The officers had reasonable suspicion of criminal activity and legitimate concerns for safety in order to continue the detention and remove Wynn from the vehicle.**

Next, Wynn argues the officers violated his Fourth Amendment rights "by prolonging the otherwise completed traffic stop in order to search his vehicle." (R. 34 at Page ID 163). He notes that "[a] seizure justified solely by the interest of issuing a ticket to the driver can become unlawful if it is prolonged beyond the time reasonabl[y] required to complete that mission." (*Id.*) (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). In a single sentence in his initial brief, Wynn asserts that "[t]here was not an objectively reasonable basis for removing Mr. Wynn from the vehicle." (R. 34 at Page ID 163).

Wynn fails to acknowledge that "the police may extend a stop beyond the scope of what was originally permissible if 'something happened *during the stop* to cause the officer to have a reasonable and articulable suspicion that criminal activity is afoot.'" *Stepp*, 680 F.3d at 661 (emphasis in original) (quoting *United States v. Davis*, 430 F.3d 345, 353 (6th Cir. 2005)). Here, Officer Morris testified that he smelled marijuana upon approaching the vehicle, that he was familiar with the odor of marijuana based on his prior experiences, and that he suspected Wynn was driving under the influence. (*See* R. 64 at Page ID 319-20). Under these circumstances, Officer Morris was permitted to prolong the traffic stop in order to investigate his reasonable suspicion that Wynn was driving under the influence. *See United States v. Noble*, 364 F. App'x 961, 964 (6th Cir. 2010) ("[T]he smell of marijuana emanating from Noble's vehicle constituted a change of circumstances that suggested Noble was engaged in illegal activity, which authorized further detention so the officers could investigate."); *United States v. Cain*, No. 19-11-DLB-CJS, 2020 WL 6038184, at *6 (E.D. Ky. May 14, 2020), *report and recommendation adopted by* 2020

20

WL 3821099 (E.D. Ky. July 8, 2020); *United States v. Lykins*, No. 12-02-DLB, 2012 WL 1947346, at *9 (E.D. Ky. May 30, 2012).

In addition, Officer Ullrich had sufficient justification to remove Wynn from the vehicle. The Supreme Court has held that "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977); *see also Johnson*, 555 U.S. at 331. The Court found that the government's "legitimate and weighty" interest in officer safety outweighs the *de minimis* intrusion in having an already lawfully detained driver exit the vehicle. *Id.* at 110-11. Subsequently, the Supreme Court extended this rationale to passengers, finding that "the same weighty interest in officer safety is present regardless of whether the occupant of the stopped car is a driver or passenger." *Maryland v. Wilson*, 519 U.S. 408, 413 (1997); *see United States v. Pacheco*, 841 F.3d 384, 390 (6th Cir. 2016) (noting that during a traffic stop, "officers do not need independent justification to remove the driver or passengers from the vehicle"). But the Supreme Court clarified the outer bounds of this rule in *Rodriguez v. United States*, finding that "safety precautions taken in order to facilitate" "[o]n-scene investigations" into crimes unrelated to the purpose of the initial stop require reasonable suspicion. 575 U.S. 348, 356-57 (2015); *see United States v. Whitley*, 34 F.4th 522, 530 (6th Cir. 2022) ("Even if asking Whitley to exit the vehicle is properly considered a safety measure, it is still a detour that requires independent reasonable suspicion because the request facilitated the investigation into the scale and did not pertain to the original traffic stop."); *see also United States v. Lang*, --- F. Supp. 3d ----, No. 22-35-DLB-CJS, 2023 WL 358242, at *5-6 (E.D. Ky. Jan. 23, 2023).

Here, Officer Ullrich had reasonable suspicion of criminal activity based on (1) the smell of marijuana, (2) Wynn's erratic driving, (3) Wynn's nervousness, and (4) Wynn's inconsistent travel plans.  In addition, Officer Ullrich's training and experience concerning firearms and their frequent use in connection with drugs provided a legitimate basis to be concerned for his safety and the safety of others.

First, Officer Ullrich testified that he noticed the smell of marijuana upon approaching the vehicle.  (*See* R. 63 at Page ID 252).  The smell of marijuana alone provided Officer Ullrich with reasonable suspicion of criminal activity.  *See Noble*, 364 F. App'x at 964; *Lykins*, 2012 WL 1947346, at *9 ("The Sixth Circuit has routinely held that detecting an odor of an illegal substance provides at least reasonable suspicion.").  Wynn resists this conclusion, arguing that the Court should discount Officer Ullrich's testimony.  (*See* R. 71 at Page ID 379-80).  Wynn points to two portions of Officer Ullrich's testimony, noting that at one point Officer Ullrich testified he reviewed his bodycam and dashcam footage prior to the evidentiary hearing (*see* R. 63 at Page ID 250), and at another point he testified he had not "seen the video" (*id*. at Page ID 259).  Based on Officer Ullrich's purportedly conflicting testimony as to whether he reviewed the relevant video footage, Wynn argues that "the entirety of Officer Ullrich's testimony should be carefully scrutinized and called into question."  (R. 71 at Page ID 380).

However, Officer Morris's independent account supports Officer Ullrich's testimony.  Officer Morris testified that he smelled marijuana upon approaching the vehicle, prior to Officer Ullrich's arrival on the scene.  (*See* R. 64 at Page ID 319).  Officer Morris explicitly mentioned the existence of the odor during the course of the traffic stop.  (*See* Morris Bodycam at 03:05:15-03:05:20) ("I can smell it walking up to the car."); *see also United States v. Conway*, No. 17-43-DLB-CJS, 2018 WL 4600306, at *7 (E.D. Ky. June 4, 2018), *report and recommendation adopted*

22

*by* 2018 WL 3435353 (E.D. Ky. July 17, 2018) (crediting officer's testimony where "[t]he body camera recordings show contemporaneous statements and reactions from the officers supporting their testimony that they smelled marijuana"); *c.f. United States v. Freeman*, 412 F. App'x 735, 743 (6th Cir. 2010) ("Even though [the officer] did not mention the odor in his initial communications with dispatch, he did call for a drug dog soon after returning to his car, which suggests that he had smelled something."). Officer Morris's narrative report expressly notes that he smelled marijuana upon approaching the vehicle. (*See* R. 61, Defendant's Exs. 1 and 2) ("Upon approach to the vehicle I could smell the odor of marijuana coming from the vehicle."). Both Officer Ullrich's and Officer Morris's testimony concerning the odor was consistent with Officer Morris's filed police report. *See Jabbi*, 2018 WL 5306989, at *3 (crediting officer's testimony because it was consistent with his own filed police report as well as another officer's filed report). And neither officer waivered in their testimony that they smelled marijuana coming from the vehicle. Indeed, the officers did in fact find marijuana as a result of the stop. (*See* R. 63 at Page ID 272-83, 284); *see also United States v. Banks*, No. 5:21-cr-00125-GFVT-MAS-1, 2022 WL 1236809, at *6 (E.D. Ky. Feb. 23, 2022), *report and recommendation adopted by* 2022 WL 964187 (E.D. Ky. Mar. 30, 2022) (finding that the eventual discovery of marijuana in a vehicle bolstered the credibility of the officers' testimony as to plain smell when approaching vehicle); *United States v. Rounsaville*, No. 1:17-cr-69-4, 2018 WL 4909903, at *8 & n.3 (E.D. Tenn. Oct. 10, 2018) (same); *United States v. Vaughn*, 429 F. Supp. 3d 499, 509 (E.D. Tenn. 2019) (same); *United States v. Davis*, No. 3:19-00154, 2020 WL 354628, at *5 (S.D. W. Va. Jan. 21, 2020) (same). Thus, the Court finds that Officers Ullrich and Morris testified credibly as to noticing the smell of marijuana emanating from the vehicle.

Second, upon Officer Ullrich's arrival at the scene of the stop, Officer Morris informed him of Wynn's erratic driving.  (*See* Morris Bodycam at 003:05:05-003:05:40).   As noted previously, Wynn's erratic driving alone provided reasonable suspicion that he was driving under the influence.  *Baker*, 475 S.W.3d at 635-36; *Davis*, 484 S.W.3d at 291; *Paolucci*, 2017 WL 2405369, at *2; *Navarette*, 572 U.S. at 402; *Jabbi*, 2018 WL 5306989, at *3.  And pursuant to the collective knowledge doctrine, the officers' "direct communication" about Wynn's erratic driving permits imputing Officer Morris's suspicions onto Officer Ullrich without requiring Officer Ullrich to "independently weigh the reasonable suspicion analysis." *Lyons*, 687 F.3d at 766 (citing *United States v. Ibarra-Sanchez*, 199 F.3d 753, 760 (5th Cir. 1999)).[6]  Thus, Officer Ullrich could rely on Officer Morris's observation of Wynn driving erratically as a basis for reasonably suspecting criminal activity.

Lastly, Officer Ullrich testified that Wynn was "extremely nervous" and that his travel plans were inconsistent.  (R. 63 at Page ID 252-54, 271).  In evaluating an officer's suspicions during a traffic stop, the Sixth Circuit has "accorded some weight" to "conflicting or implausible explanations of travel plans," but generally only when the travel plans are not in fact "reconcilable."  *United States v. Winters*, 782 F.3d 289, 299-300 (6th Cir. 2015) (citing *United States v. Townsend*, 305 F.3d 537, 543 (6th Cir. 2002) and then *Richardson*, 385 F.3d at 631).  And although the Sixth Circuit generally gives "little weight" to nervousness because "'it is an unreliable indicator, especially in the context of a traffic stop," *id*. at 299 (quoting *Richardson*, 385 F.3d at 630), "weak support is support nonetheless, particularly when considered as part of a single mosaic along with [] unusual travel evidence." *United States v. Williams*, 68 F.4th 304, 308 (6th

---

[6] "The collective knowledge doctrine applies equally to traffic stops and to vehicle searches." *Lyons,* 687 F.3d at 766 n.4.

Cir. 2023) (citing *United States McCallister*, 39 F.4th 368, 374 (6th Cir. 2022) and then *Pacheco*, 841 F.3d at 393).

Here, Wynn told Officer Ullrich that he was going to his child's mother's house, that he had picked someone up and gave them a ride for some money, and that he was going home. (*See* Ullrich Bodycam at 03:05:45-03:07:32; *see also* R. 63 at Page ID 252-54, 271). Wynn's alleged travel plans are not "mutually exclusive," in that it is possible that around 3:00 a.m., Wynn could have given a person a ride on his way home, where his child's mother also lived. *Richardson*, 385 F.3d at 631; *see Winters*, 782 F.3d at 299 (collecting cases involving reconcilable travel plans). However, Wynn informed Officer Ullrich that he did not know how to get to his child's mother's house, i.e., that he did not know how to get to his own residence. Given the proximity of the stop to Wynn's alleged residence (*see* R. 63 at Page ID 253-54), it was reasonable for Officer Ullrich to suspect that Wynn's travel plans may have been fabricated. That is not to say that being lost provides an officer with reasonable suspicion of criminal activity; rather, the surrounding circumstances—Wynn's erratic driving and the smell of marijuana—shed a suspicious light on Wynn's nervousness and alleged travel plans, making it reasonable to suspect that the travel plans were fabricated. *See United States v. Bloodworth*, 789 F. App'x 842, 846 (6th Cir. 2019) (quoting *Arvizu*, 534 U.S. at 274) ("[B]ehavior that might be 'by itself readily susceptible to an innocent explanation' can nevertheless form part of the basis of an officers' reasonable suspicion."); *Sokolow*, 490 U.S. at 9 ("Any one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel. But we think taken together they amount to reasonable suspicion."); *see also Townsend*, 305 F.3d at 543 (noting that the Sixth Circuit has "repeatedly recognized that lying about travel plans can form the basis for reasonable suspicion").

As for Officer Ullrich's concern for safety, Officer Ullrich testified that he had an "elevated concern for weapons" when he smelled marijuana because based on his experience and training, drugs are "closely associated" with weapons, "specifically firearms." (R. 63 at Page ID 252-53). Officer Ullrich also testified that Wynn's drug alert out of Ohio further raised those concerns. (*See* R. 63 at Page ID 257; *see also* Ullrich Bodycam at 03:10:05-03:10:15). Notably, the Sixth Circuit has held that "officers who stop a person who is 'reasonably suspected of carrying drugs,' are 'entitled to rely on their experience and training in concluding that weapons are frequently used in drug transactions.'" *United States v. Jacob*, 377 F.3d 573, 579-80 (6th Cir. 2004) (quoting *United States v. Heath*, 259 F.3d 522, 530 (6th Cir. 2001)). Thus, Officer Ullrich was permitted to rely on his training and experience to conclude that Wynn may be armed, giving rise to a legitimate concern for safety. *See Noble*, 364 F. App'x at 964 (finding smell of marijuana supported officer's reasonable belief that defendant driver was armed); *Jacob*, 377 F.3d at 579 (finding officers' decision to order occupants out of vehicle and to handcuff them reasonable based on concern for officer safety where vehicle contained suspected drug traffickers who, according to the officers' training and experience, were presumed to be armed); *United States v. Borne*, 239 F. App'x 185, 186-87 (6th Cir. 2007) (finding defendant's prior conviction for methamphetamine-related offenses and strong chemical odor supported officer's decision to remove defendant from vehicle). Therefore, Officer Ullrich had a legitimate concern for officer safety.

In sum, at the time Officer Ullrich removed Wynn from the vehicle, Officer Ullrich was aware that Officer Morris stopped the vehicle for driving erratically; that Officer Morris noticed the smell of marijuana upon approaching the vehicle; that based on his own observations, the smell of marijuana was emanating from the vehicle; that Wynn was extremely nervous; and that Wynn provided implausible or conflicting travel plans. Under the totality of the circumstances, Officer

Ullrich had reasonable suspicion of criminal activity and a legitimate concern for officer safety in order to remove Wynn from the vehicle. Thus, Officer Ullrich did not violate the Fourth Amendment by removing Wynn from the vehicle.

### C. Officer Ullrich had reasonable suspicion that Wynn was armed and dangerous in order to conduct a pat down, resulting in the lawful seizure of marijuana based on Officer Ullrich's plain feel.

During a traffic stop, an officer "may 'perform a patdown of a driver and any passengers upon reasonable suspicion that they may be armed and dangerous.'" *Johnson*, 555 U.S. at 331 (quoting *Knowles v. Iowa*, 525 U.S. 113, 117-18 (1998)). In this context, the reasonable suspicion inquiry "demands a particularized and objective basis for suspecting [that] the particular person is armed and dangerous." *United States v. Noble*, 762 F.3d 509, 522 (6th Cir. 2014). "Ultimately, the test is whether 'a reasonably prudent [person] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger.'" *Pacheco*, 841 F.3d at 390 (quoting *Noble*, 762 F.3d at 521-22 (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968))).

As noted previously, Officer Ullrich had reasonable suspicion that Wynn was carrying drugs based on the totality of the circumstances, particularly, the smell of marijuana emanating from the vehicle. *See Noble*, 364 F. App'x at 964; *Lykins*, 2012 WL 1947346, at *9. And because Officer Ullrich reasonably suspected Wynn of carrying drugs, it was also reasonable for him to suspect, based on his training and experience, that Wynn may be armed. *See Noble*, 364 F. App'x at 965 (finding officer's reasonable suspicion that defendant driver was carrying drugs based on smell of marijuana supported his belief that defendant was armed, thus permitting pat down); *see also Noble*, 762 F.3d at 524-25 (citing *Noble*, 364 F. App'x at 965) (recognizing that during stop for traffic violation, smell of marijuana constitutes "some corroboration" that occupants are "involved in dealing drugs," permitting pat down); *c.f. United States v. Richardson*, 310 F. App'x

27

1, 4-5 (6th Cir. 2008) (upholding frisk based on confidential informant's tip and the smell of marijuana). In addition, Officer Ullrich testified that Wynn failed to follow the directive to place his hands on top of the vehicle and that he reached towards his waistband. *See Pacheco*, 841 F.3d at 393-94 (concluding defendant's failure to comply with officer's commands supported finding reasonable suspicion that defendant was armed and dangerous); *see also United States v. McDaniel*, 371 F. App'x 617, 621 (6th Cir. 2010) (finding defendant's nervous behavior and reaching into waistband provided reasonable suspicion that he was armed and dangerous); *c.f. United States v. Tillman*, 543 F. App'x 557, 561 (6th Cir. 2013) ("On balance, our cases suggest that when a suspect's movements cannot be observed by the officer and the suspect does not listen to orders, the risk of danger rises, making a decision to frisk reasonable under the circumstances."). Thus, based on Officer Ullrich's training and experience concerning the smell of marijuana, Wynn's failure to comply with orders, and Wynn's reaching toward his waistband, Officer Ullrich had reasonable suspicion that Wynn was armed and dangerous in order to conduct a pat down.

Having found that the pat-down was supported by reasonable suspicion, the Court must next determine whether the seizure of the marijuana was reasonable. Wynn argues that the pat down exceeded the permissible scope, noting that "[b]ecause the sole justification for such a search is the protection of the police officer and others nearby, 'it must . . . be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer.'" (*Id.* at Page ID 379) (quoting *Terry v. Ohio*, 392 U.S. 1, 29 (1968)). However, the Supreme Court has held that

> [i]f a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context.

28

*Minnesota v. Dickerson*, 508 U.S. 366, 375-76 (1993). In other words, "an officer does not need to ignore contraband should any be discovered" during a pat down. *Pacheco*, 841 F.3d at 394.

To seize contraband felt during a *Terry* pat down, "(1) the police must be in a lawful position from which they view (or feel) the object; (2) the object's incriminating nature must be immediately apparent; and (3) the officers must have a lawful right of access to the object." *Id.* at 394-95. Because the traffic stop, removal of Wynn from the vehicle, and the pat-down of his person were all constitutionally permissible, Officer Ullrich was in a lawful position to feel the contraband during the pat down, and he also had a lawful right of access to it. *See id.* at 395 & n.4. The remaining issue is whether the object's incriminating nature was immediately apparent. The Sixth Circuit looks to three factors in determining whether an object's "incriminatory nature" is immediately apparent, "'none of which is necessary but each of which is instructive.'" *Id.* (quoting *United States v. Garcia*, 496 F.3d 495, 510 (6th Cir. 2007)). Those factors are:

> (1) a nexus between the seized object and the [suspected criminal activity]; (2) whether the intrinsic nature or appearance of the seized object gives probable cause to believe that it is associated with criminal activity; and (3) whether the executing officers can at the time of discovery of the object on the facts then available to them determine probable cause of the object's incriminating nature.

*Id.* Notably, probable cause "does not require that officers *know* that evidence is contraband;" rather, "it merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief' that certain items may be contraband or stolen property or useful as evidence of a crime." *United States v. McLevain*, 310 F.3d 434, 441 (6th Cir. 2002) (emphasis in original) (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983)).

The plain feel principles confirm that Officer Ullrich's discovery of the marijuana on Wynn's person was constitutional. Officer Ullrich testified that while running a flat hand on the exterior of Wynn's clothes along his right leg and right pants pocket, he felt a "foreign object" that

he "believed was obviously marijuana."  (R. 63 at Page ID 257; *see also* Ullrich Bodycam at 03:09:10-03:09:25).  Officer Ullrich clarified that he could tell the object was "an organic, leafy kind of material . . . shaped in kind of a spherical mound which is very common when . . . bagging up marijuana in small amounts."  (R. 63 at Page ID 257).  These facts, present at the time of the item's discovery, indicated that the item was marijuana and that there was probable cause to believe that it was contraband and that it was associated with the specific offense under investigation, driving under the influence.  Indeed, prior to Officer Ullrich removing the object from Wynn's pocket, Wynn admitted that it was in fact marijuana.  (*See* Ullrich Bodycam at 03:09:25-03:09:40).  Based on Officer Ullrich's training and experience, credible testimony, and the surrounding circumstances, he lawfully seized the marijuana pursuant to the plain-feel doctrine.  *See, e.g.*, *United States v. Walker*, 181 F.3d 774, 775 (6th Cir. 1999) (finding that the officer's experience with narcotics investigations informed his immediate belief, on plain feel, that a bulge in the suspect's pants was a package of drugs); *United States v. Moore*, 8 F. App'x 354, 356 (6th Cir. 2001) (affirming denial of suppression where drugs were detected during lawful *Terry* search and there was at the time of discovery probable cause to believe they were contraband given all of the investigative circumstances).

Wynn resists this conclusion, taking issue with the credibility of Officer Ullrich's testimony that he performed a "flat-hand search" and that he could feel "organic material" in Wynn's pocket.  (R. 71 at Page ID 379).  Wynn again points to Officer Ullrich's conflicting testimony concerning his review of the video footage.  (*See id*. at Page ID 379-80).  Wynn notes that "[a] trial court's decision to credit a witness' testimony may be held erroneous if objective evidence contradicts the witness's story, or the story itself is so implausible or internally inconsistent that a reasonable factfinder would not credit it."  (*Id*.) (citing *United States v. Haynes*,

301 F.3d 669, 679-81 (6th Cir. 2002)).  In *Haynes*, the Sixth Circuit enunciated the relevant standard as follows: "A trial court's decision to credit a witness' testimony may be held erroneous on review if '[d]ocuments or objective evidence . . . contradict the witness' story; or the story itself [is] so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it."  301 F.3d at 679-80 (quoting *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985)).  Wynn does not point to any documents or objective evidence to contradict Officer Ullrich's testimony, nor does he point to a portion of Officer Ullrich's testimony *concerning the pat down* that is internally inconsistent.

In addition, the Court does not find Officer Ullrich's testimony concerning the pat down to be "so implausible on its face that a reasonable factfinder would not credit it."  *Id*.  Officer Ullrich testified that he had been a traffic accident prevention ("TAP") officer since February of 2014, "targeting traffic enforcement, DUI investigation[s], and collision investigation[s]."  (R. 63 at Page ID 246-47).  He further testified that he had been a certified drug recognition expert ("DRE") since 2017, conducting over 5,000 DUI investigations as part of his certification and ongoing training. (*Id*.).  Officer Ullrich clarified that DREs "are typically brought in when someone is impaired and specifically when they may be impaired on a substance other than alcohol."  (*Id*.).  Officer Ullrich also testified that he has extensive experience in the field regarding marijuana specifically.  (*See id*. at Page ID 248-49).  Given Officer Ullrich's extensive experience with drug investigations generally and marijuana specifically, it is not implausible on its face that he was able to immediately determine based upon a flat-hand pat down that the foreign object in Wynn's pocket was marijuana.  In short, Officer Ullrich's pat down did not exceed its scope; therefore, there was no Fourth Amendment violation when he seized the marijuana from Wynn's person.

**D.** **Having lawfully seized marijuana from Wynn's person, the officers had probable cause to arrest him, and did in fact place him under arrest; thus, the search of his person was permitted as a search incident to lawful arrest.**

Next, Wynn argues that the search of his person was not supported by a warrant. (*See* R. 71 at Page ID 378). The Government argues that the officers had probable cause to arrest Wynn upon discovering the marijuana as a result of the lawful pat down; thus, the search of his person was permitted as a search incident to a lawful arrest. (*See* R. 72 at Page ID 387-88).

"[W]arrants are generally required to search a person's home or his person. . . ." *Mincey v. Arizona*, 437 U.S. 385, 393-94 (1978). However, "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). In addition, "a law enforcement officer may conduct a full search of an arrestee's person incident to a lawful custodial arrest." *United States v. Montgomery*, 377 F.3d 582, 586 (6th Cir. 2004) (citing *United States v. Robinson*, 414 U.S. 218, 234-35 (1973)). Moreover, an officer can perform the search *before* the lawful custodial arrest, "as long as 'the formal arrest follows quickly on the heels of the challenged search of his person' and the fruits of that search are not necessary to sustain probable cause against him." *Id*. (alterations omitted) (quoting *Rawlings v. Kentucky*, 448 U.S. 98, 110-11 n.6 (1980)).

As noted previously, Officer Ullrich discovered the marijuana on Wynn's person during a lawful pat down and seized the marijuana pursuant to the plain-feel doctrine. The marijuana provided Officer Ullrich with probable cause to arrest Wynn for possession of marijuana. *See* KRS § 218A.1422 (defining possession of marijuana as a misdemeanor); *see also Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988) (defining probable cause in the arrest context as "the facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or

32

one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense"). Therefore, the officers were permitted to search Wynn incident to a lawful arrest.

However, both parties give short shrift to determining if and when an arrest actually occurred. *C.f. Knowles v. Iowa*, 525 U.S. 113, 115-16 (1998) (rejecting argument that "so long as the arresting officer had probable cause to make a custodial arrest, there need not in fact have been a custodial arrest" in order to search a vehicle following a traffic stop where officer could have arrested the defendant but issued a citation instead). For its part, the Government asserts that the officers had probable cause to arrest Wynn on several different grounds. (*See* R. 72 at Page ID 387-88) (noting discovery of marijuana on Wynn's person, Wynn's attempt to leave, and Wynn's resisting). But whether an officer has a sufficient basis to arrest a person is a distinct inquiry from *when* the arrest occurred, if at all, particularly in cases where the Government justifies an officer's pre-arrest search of a subject as incidental to an arrest. *See Montgomery*, 377 F.3d at 586 (noting that an arrest must occur "quickly on the heels" of the challenged search). On one hand, the officers in this case used some level of force to secure Wynn and place him in handcuffs after he exited the vehicle, suggesting that he was under arrest at that point. *See Montgomery*, 377 F.3d at 587 & n.3 (finding it unclear whether seizure remained an investigative detention or became a full custodial search, noting there was no evidence that the officers drew their weapons, handcuffed the defendant, or used force). However, as noted previously, the officers had reasonable suspicion of criminal activity and legitimate concerns for their safety, thereby justifying the decision to remove Wynn from the vehicle, place him in handcuffs, and perform a pat-down of his person. *See id*. (noting that "even without arresting the defendant, the troopers had sufficient justification

to order defendant out of the vehicle and to frisk him," and "likely had adequate justification to place defendant in the back of the patrol car").

Here, Wynn remained under investigatory detention at the time Officer Ullrich seized the marijuana from his person despite being in handcuffs. *See United States v. Atchley*, 474 F.3d 840, 849 (6th Cir. 2007) (noting handcuffing "is appropriate even when police are merely detaining, but not arresting, a suspect"); *Houston v. Clark Cnty. Sheriff Deputy John Does 1-5*, 174 F.3d 809, 814-15 (6th Cir. 1999) (holding that, where police officers reasonably believed that a vehicle's occupants had just been involved in a shooting, the officers' ordering the suspects out of the vehicle, drawing their weapons on them, frisking and handcuffing them, and detaining them in the back of patrol cars did not exceed the bounds of a *Terry* investigative detention) *see also United States v. Heath*, 259 F.3d 522, 530 (6th Cir. 2001) (noting that the Sixth Circuit "permits the use of force, such as handcuffs and guns, to effect a stop when such a show of force is reasonable under the circumstances of the stop" and has "uniformly found that the use of force must be necessary to protect officers from potentially dangerous situations"). Rather, the record suggests that Wynn was not under arrest until after Officer Ullrich repositioned Wynn to the front of the cruiser in order to capture the search of his person. Indeed, when Wynn attempted to walk away from the officers, Officers Morris and Elsbernd prevented Wynn from doing so by wrestling him onto the hood of the cruiser. (*See* Morris Bodycam, Elsbernd Bodycam, and Dashcam at 03:11:10-03:11:40). Officers Morris and Elsbernd testified that they prevented Wynn from walking away because they were concerned for his safety, for their safety, and for the potential for Wynn to destroy or discard the suspected evidence in his underwear and because Wynn was "not free to go wherever he want[ed] to" and was "going to stay" where the officers directed him to stay. (R. 63 at Page ID 301-02; R. 64 at Page ID 325-27); *see United States v. Butler*, 223 F.3d 368, 374 (6th

Cir. 2000) ("A 'seizure' occurs . . . when the police detain an individual under circumstances where a reasonable person would feel that he or she is not at liberty to leave").  Officer Ullrich testified that he was going to arrest Wynn based on seizing the marijuana and Wynn's behavior.  (R. 63 at Page ID 274-75).  Indeed, when Officer Ullrich returned from the rear of the cruiser, he told Wynn that he was going to jail.  (*See* Ullrich Bodycam at 03:12:00-03:12:30); *see also United States v. Rose*, 889 F.2d 1490, 1493 (6th Cir. 1989) (noting that an officer's subjective intent is relevant to determining whether a person has been seized within the meaning of the Fourth Amendment only to the extent that the officer's intent was conveyed to the person confronted) (citing *United States v. Mendenhall*, 446 U.S. 544, 554 n.6 (1980)).  Wynn was under arrest at that point and the officers were therefore permitted to conduct a full search of his person incident to his arrest.

Wynn resists this conclusion, arguing that the search exceeded its proper scope when the officers held him on the ground and utilized scissors to cut off his underwear on the side of the road.  (*See* R. 71 at Page ID 377).  The bodycam demonstrates that Wynn actively struggled with the officers throughout the entire police encounter.  (*See generally* Bodycam and Dashcam).  Indeed, the officers testified that they took Wynn to the ground because he was getting belligerent and agitated.  (*See* R. 63 at Page ID 303; R. 64 at Page ID 328).  The officers further testified that Wynn's behavior made them concerned for his safety as well as their safety.  (R. 63 at Page ID 301-02; R. 64 at Page ID 325-27).  Officer Ullrich testified that the officers spent roughly "ten minutes trying to just get those drugs out of his underwear," and that Wynn was "exceptionally successful in preventing [the officers] from accessing the drugs in his underwear."  (R. 63 at Page ID 266-7).  In fact, at one point, Wynn told the officers, "You're not searching me.  You're going to have to kill me."  (*See* Ullrich Bodycam at 03:16:00-03:16:30; *see also* R. 64. at Page ID 329).  Officer Ullrich further testified that he decided to remove Wynn's underwear because he was

concerned that Wynn's continued struggling would injure Wynn or the officers. (*See id*. at Page
ID 267; *see also* Ullrich Bodycam at 03:21:50-03:22:40).

Under these circumstances, it was reasonable for the officers to remove Wynn's underwear
in order to retrieve the suspected contraband. "It is well established that 'exigent circumstances,'
including the need to prevent the destruction of evidence, permit police officers to conduct an
otherwise permissible search without first obtaining a warrant." *Kentucky v. King*, 563 U.S. 452,
455 (2011). In addition, "handcuffing is not a 'fail-safe method' of preventing arrestees from
causing harm to police officers" or destroying evidence. *United States v. Certain*, No. 19-13-DLB-
EBA, 2020 WL 1164836, at *3 (E.D. Ky. Mar. 11, 2020) (quoting *United States v. Shakir*, 616
F.3d 315, 319-21 (3d Cir. 2010)). Here, based on the lawful pat down and plain feel of the
suspected contraband, the officers had lawful authority to search Wynn's person and to seize the
drugs felt in his underwear. Wynn's active resistance to prevent the search does not render the
officers' efforts unreasonable, particularly when there were exigent circumstances justifying the
seizure of the drugs. If Wynn were placed in the back of the cruiser without removing the
suspected drugs, he would have potentially had access to the evidence and therefore the ability to
destroy it, discard it, or use it to harm himself or the officers. Indeed, Officer Ullrich testified that
based on personal experience, handcuffs would not always prevent someone from accessing
objects on their person while in a police cruiser. (*See* R. 63 at Page ID 264). Officer Ullrich
further testified that the drugs themselves could pose a considerable safety risk given their
unknown nature and the lethality of drugs like fentanyl. (*See id*. at Page ID 263-64, 280-81).
Therefore, the officers' search of Wynn's person was reasonable under the Fourth Amendment.
*See United States v. Jackson*, 801 F. App'x 941, 947 (6th Cir.), *cert. denied*, 140 S. Ct. 2789 (2020)
(finding search for drugs that exposed defendant's groin was reasonable, noting that "while it

occurred on a public street, the record establishes that it was a dark night, and the only other persons present were 50 or 60 feet away"); *see also United States v. Williams*, 477 F.3d 974, 976 (8th Cir. 2007) ("The police could not have removed the drugs that Williams stashed near his genitals without making some 'intimate contact,' and we reject Williams's claim that such contact is *per se* unreasonable. Some physical contact is permissible, and indeed unavoidable, when police reach into a suspect's pants to remove drugs the suspect has chosen to hide there.").

The Government argues that even if the manner in which the officers seized the cocaine from Wynn's person was unreasonable, the cocaine would have inevitably been discovered pursuant to a full search at the jail. (*See* R. 72 at Page ID 388). However, "[t]o avail itself of the inevitable-discovery doctrine by invoking the inventory-exception," the Government needs to prove, among other things, "'that when the police in the police agency in question conducted inventory searches, they did so pursuant to established or standardized procedures.'" *United States v. McCants*, --- F. Supp. 3d ----, No. 2:22-CR-20320-TGB-APP, 2023 WL 4068565, at *11 (E.D. Mich. June 16, 2023) (quoting *United States v. Mendez*, 315 F.3d 132, 138 (2d Cir. 2002)). And although the Sixth Circuit has held that evidence of a written policy is not necessary, *see United States v. Alexander*, 954 F.3d 910, 916 (6th Cir. 2020), "the government nonetheless must establish that some set of guiding principles governing the scope of the search and its execution exists for this exception to apply," *McCants*, 2023 WL 4068565, at *11 (citing *Alexander*, 954 F.3d at 916).

Here, Officer Ullrich testified that Wynn would have been taken to the Kenton County Jail once arrested and that the jail would have conducted a complete search of his person, including his underwear. (*See* R. 63 at Page ID 275). However, this testimony was in response to the prosecutor's question, "*Based on your training and experience*, if he's arrested, where would he have been taken?" (*Id.*) (emphasis added). In other words, it appears that Officer Ullrich was

37

testifying that Wynn would have been searched at the jail based on his prior experience, not that the jail had an established or standardized policy. Even assuming that Officer Ullrich's testimony implies that the jail has such a policy, implication is not enough. *See United States v. Doxy*, 833 F.3d 692, 706 n.2 (6th Cir. 2016) ("While it is certainly possible that the Muskegon County Jail routinely strip-searches incoming detainees as part of its intake processing, and that the drugs would have been discovered at that time, there is no evidence in the record about the Muskegon County Jail's procedures. The record therefore lacks sufficient evidence from which to make this determination."). Given the uncertainty of the jail's procedures, the Court declines to further consider the Government's inevitable discovery argument. Suppression is nonetheless unwarranted because, as discussed previously, the search of Wynn's person did not violate the Fourth Amendment.

### E.    The officers had probable cause to search the vehicle.

Next, Wynn argues that the officers lacked the authority to search the vehicle and that the search-incident-to-arrest rule announced in *Arizona v. Gant*, 556 U.S. 332 (2009) does not apply. (*See* R. 34 at Page ID 162-63). Specifically, Wynn asserts that "this exception does not permit an officer to search a vehicle after an arrestee has been secured and cannot access the interior of the vehicle." (*Id*. at Page ID 162; *see also* R. 71 at Page ID 378-79).

As an initial matter, the Court readily agrees with Wynn that the first prong of *Arizona v. Gant* does not apply here. In *Arizona v. Gant*, the Supreme Court held that "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." *Arizona v. Gant*, 556 U.S. 332, 351 (2009). In this case, it is undisputed that the search of Wynn's vehicle was not conducted until after Wynn had

been handcuffed and placed into the back of a police cruiser. (*See* R. 64 at Page ID 332; *see also* R. 63 at Page ID 304-05). Thus, under *Gant*, the officers lacked a legitimate concern for officer safety and evidence preservation in order to search the vehicle. *See Gant*, 556 U.S. at 339 ("If there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply.") (citation omitted).

However, under the circumstances, it was "reasonable to believe the vehicle contain[ed] evidence of the offense of arrest." *Id*. at 351. "While the Sixth Circuit has not expressly stated the meaning of the phrase 'reasonable to believe' in the context of the search incident to a lawful arrest exception, it has stated that a 'reasonable belief standard' is 'lesser' than a probable cause standard." *United States v. Salahuddin*, No. 5:21-cr-18-JMH, 2021 WL 2954396, at * 3 (E.D. Ky. July 14, 2021) (quoting *United States v. Pruitt*, 458 F.3d 477, 482 (6th Cir. 2006)); *see also United States v. Kinloch*, No. CR420-082, 2021 WL 3698899, at *6 (S.D. Ga. July 27, 2021), *report and recommendation adopted by*, 2021 WL 3700721 (S.D. Ga. Aug. 19, 2021) ("While the Court [in *Gant*] did not flesh out the reasonable-to-believe standard, a number of appellate courts have concluded that it appears to require a lesser quantum of suspicion than probable cause, and probably is akin to the reasonable suspicion standard required to justify a *Terry* search.") (quotations and citations omitted).

In this case, the officers arrested Wynn for several reasons, one of which was for possession of marijuana. Officer Morris cited Wynn for possession of marijuana in his police report. (*See* R. 61, Defendant's Ex. 1 and 2). Officer Ullrich testified that once he found marijuana in Wynn's pocket, Wynn was going to be arrested and, in fact, told Wynn as much. (*See* R. 63 at Page ID 274-75). The Sixth Circuit has noted *Gant*'s "relatively scant exposition" concerning the "crime

of arrest" language in the second prong. *Thomas v. Plummer*, 489 F. App'x 116, 120-22 (6th Cir. 2012) (discussing the two approaches to *Gant*'s language but declining to adopt either rubric). However, *Gant* itself makes clear that an arrest for possession of marijuana will generally supply a basis for searching a vehicle:

> [T]he *Gant* court elaborated that "[i]n many cases, as when a recent occupant is arrested for a traffic violation, there will be no reasonable basis to believe the vehicle contains relevant evidence." *Gant*, 556 U.S. at 343 (citing cases involving arrest for failing to wear a seatbelt, driving without a license, failure to provide proof of insurance, and speeding). "But in others, . . . the offense of arrest will supply a basis for searching the passenger compartment of an arrestee's vehicle and any containers therein." *Gant*, 556 U.S. at 344 (citing cases involving arrests for *possession of marijuana* and crack cocaine).

*United States v. Stapleton*, No. 12-11-ART, 2013 WL 3935104, at \*17 (E.D. Ky. July 30, 2013) (emphasis added). Thus, it was reasonable for the officers to believe that the vehicle contained evidence of the crime of arrest—possession of marijuana. *See United States v. Alexander*, 954 F.3d 910, 917 (6th Cir. 2020) (concluding that arrest for possession of methamphetamine would have permitted search of vehicle under second prong of *Gant*).[7]

In any event, the officers had probable cause to search the vehicle under the automobile exception. Under that exception, officers are permitted to conduct a warrantless search of a vehicle if they have "probable cause to believe that the vehicle contains evidence of a crime." *United States v. Galaviz*, 645 F.3d 347, 355 (6th Cir. 2011). Notably, the Sixth Circuit has held that the smell of marijuana coming from a vehicle, alone, provides probable cause to search the vehicle.

---

[7] Notably, even if the crime of arrest was driving under the influence, it would have been reasonable for the officers to believe the vehicle contained evidence of driving under the influence. *See Stapleton*, 2013 WL 3935104, at \*17 (collecting cases finding that *Gant* justifies the search of a passenger compartment upon arrest for DUI or open alcohol container); *see also Taylor v. Commonwealth*, No. 2015-CA-000337-MR, 2016 WL 3574606, at \*2 (Ky. Ct. App. June 24, 2016) (finding reasonable suspicion of driving under the influence gave rise to reasonable suspicion that the vehicle harbored evidence of the crime of arrest under second prong of *Gant*).

*See United States v. Sheckles*, 996 F.3d 330, 345 (6th Cir.), *cert. denied*, 142 S. Ct. 717 (2021); *see also Brooks*, 987 F.3d at 599-600 (collecting cases).  As noted, Officers Morris and Ullrich credibly testified that they smelled marijuana emanating from the vehicle.  (*See* R. 63 at Page ID 252; R. 64 at Page ID 319).  Thus, the officer's smell of the marijuana, alone, provided probable cause to search the vehicle.  *See Sheckles*, 996 F.3d at 345; *Brooks*, 987 F.3d at 599-600.

Wynn resists the conclusion that the officers were permitted to search his vehicle, arguing that the officers improperly utilized the keys from Wynn's person to search the locked glove compartment and locked trunk.  (*See* R. 71 at Page ID 378).  As an initial matter, "[t]he scope of a warrantless search of an automobile . . . is not defined by the nature of the container in which the contraband is secreted.  Rather, it is defined by the object of the search and the places in which there is probable cause to believe that [the contraband] may be found."  *United States v. Howton*, 260 F. App'x 813, 817 (6th Cir. 2008) (quoting *United States v. Ross*, 456 U.S. 798, 824 (1982)); *Stapleton*, 2013 WL 3935104, at *18.  Because marijuana could have been stored in virtually any portion of the vehicle, the officers had authority to search the entirety of the vehicle.  *See United States v. Crotinger*, 928 F.2d 203, 205 (6th Cir. 1991) (noting that under the automobile exception, "probable cause extends to justify the search of every part of the vehicle and all containers found therein in which contraband could be hidden").  In addition, Officer Elsbernd did not utilize the keys  to access the trunk; instead, he opened the trunk by using the latch by the driver-side door.  (*See* Elsbernd Bodycam at 03:49:20-03:03:51:15).  Thus, the only question is whether the officers had lawfully seized Wynn's keys in order to unlock the glove compartment.

Police officers may seize "both contraband and any instrumentalities, fruits, or evidence of a crime that they discover in the course of the search."  *United States v. Stewart*, 315 F. App'x 554, 559 (6th Cir. 2009).  In *Stewart*, the Sixth Circuit found that police had probable cause to

seize a set of car keys found on the defendant's person during a search incident to lawful arrest when there was reason to believe that the vehicle associated with the keys contained "fruits, evidence or instrumentalities of [defendant's] drug-related offense." *Id.* at 560; *see also United States v. Shelton*, 742 F. Supp. 1491, 1495-96 (D. Wyo. 1990) (collecting cases for the proposition that police may seize keys from a person during a search incident to arrest). Notably, the Eastern District of Kentucky has found it reasonable for an officer to seize keys from a person during a search incident to arrest for a drug-related offense in order to search the locked glove compartment of a vehicle following a traffic stop. *See United States v. Turner*, No. 18-53-DLB-CJS-1, 2019 WL 2814648, at *5 (E.D. Ky. July 2, 2019); *see also United States v. Harvey*, No. 5:17-CR-86-DCR-REW, 2017 WL 7018478, at *7 (E.D. Ky. Sept. 11, 2017) (same). Here, the officers had probable cause to believe that there was evidence of marijuana in the car Wynn was driving based on the smell of marijuana emanating from the vehicle and the plain-feel seizure of marijuana during the lawful pat down of Wynn's person. In other words, there was a nexus between the car's keys and the suspected criminal activity. Therefore, the officers lawfully seized Wynn's keys during the search incident to arrest and were permitted to use them to open the locked glove compartment during the search of the vehicle. *See Turner*, 2019 WL 2814648, at *5; 2017 WL 7018478, at *7.

Finally, Wynn makes a passing argument that the "evidence taken from the cellular telephone(s) seized" should be suppressed. (R. 34 at Page ID 161). In support, Wynn notes that "[t]he 'search incident' doctrine does not permit the warrantless search of cellular telephones." (*Id.* at Page ID 162; R. 71 at Page ID 379) (citing *Riley v. California*, 573 U.S. 373 (2014)). The testimony Wynn's counsel elicited at the evidentiary hearing suggests Wynn is arguing that Officer

Morris searched the cell phone within the meaning of the Fourth Amendment when he placed it in airplane mode. (*See* R. 64 at Page ID 333-34, 337).

The point is well taken that police may not search a cell phone incident to an arrest. *See Riley v. California*, 573 U.S. 373, 403 (2014) ("Our answer to the question of what police must do before searching a cell phone seized incident to an arrest is accordingly simple—get a warrant."). In addition, the Supreme Court's decision in *Riley* suggests that placing a phone in airplane mode in order to preserve evidence can be unreasonable depending on the circumstances. *See id*. at 401-02 ("[E]ven though the search incident to arrest exception does not apply to cell phones, other case-specific exceptions may still justify a warrantless search of a particular phone," including "the need to prevent the imminent destruction of evidence in individual cases"); *id*. at 390 ("[A]s to remote wiping, law enforcement is not without specific means to address the threat. Remote wiping can be fully prevented by disconnecting a phone from the network."); *id*. at 391 ("[I]f officers happen to seize a phone in an unlocked state, they may be able to disable a phone's automatic-lock feature in order to prevent the phone from locking and encrypting data. Such preventative measures could be analyzed under the principles set forth in our decision in [*Illinois v.*] *McArthur*, 531 U.S. 326 [(2001)], which approved officers' reasonable steps to secure a scene to preserve evidence while they awaited a warrant."). Indeed, the Sixth Circuit has expressly acknowledged the application of *McArthur* to placing a cell phone in airplane mode. *See United States v. Evans*, 780 F. App'x 340, 344 (6th Cir. 2019) (remanding for district court to further develop factual record because although "[t]he steps [the officer] took to enable airplane mode via the settings application would seem to require scrutiny under *McArthur*, . . . *McArthur* outlined a fact-intensive, multi-factor analysis for which the current record is altogether unsuited."); *see also id*. at 344 n.2 (pondering whether the factors outlined in *McArthur* "implicate (or overlap with) the

43

Supreme Court's longstanding doctrine that searches and seizures based on mistakes of fact can be reasonable. After all, [the officer] only glimpsed the child pornography because he made a *mistake*—swiping left was not, as he believed, a way to access the settings application and enable airplane mode.") (emphasis in original) (quotations and citations omitted).[8]

However, it is not clear what evidence Wynn seeks to suppress. Wynn does not identify what information, if any, Officer Morris could have gleaned from placing the cell phone in airplane mode. Indeed, at the evidentiary hearing, neither Wynn nor the Government identified any evidence obtained as a result of Officer Morris's placing of the phone in airplane mode. (*See* R. 64 at Page ID 333-34). Rather, Officer Morris testified that he did not need to access the phone's information in order to place it in airplane mode. (*See id*. at Page ID 337).

Regardless, Wynn does not challenge the sufficiency of the warrants subsequently obtained by law enforcement to search the phone. And the warrants did not include any information that Officer Morris supposedly gleaned from placing the cell phone in airplane mode. (*See* R. 61, Defendant's Exs. 1 and 2) (asserting probable cause to search the phone based on the circumstances of the stop, including Wynn's erratic driving, the smell of marijuana, the seizure of marijuana from Wynn's person as a result of a pat down, Wynn's resistance and damage to the hood of the cruiser, the seizure of cocaine from Wynn's person, the seizure of several firearms, and the seizure of "an Iphone Model: A1687 with FCC ID:BCG-E2944A and IC: 579C-E2944A in a White and Gray Case"). Therefore, the warrants were untainted from any allegedly violative search of the phone conducted at the scene and the subsequent download of the phones would have inevitably

---

[8] On remand, it does not appear that any further hearing on the motion to suppress was held. Instead, the defendant pleaded guilty pursuant to a plea agreement and was sentenced to a term of 60 months imprisonment, 10 months less than the sentence imposed prior to successfully appealing the district court's denial of his motion to suppress. *See United States v. Evans*, No. 1:17-cr-279-DAP (N.D. Ohio), ECF Nos. 24, 25, 34, 37, 46, and 47.

discovered any information contained therein. Thus, suppression is unwarranted with respect to any information obtained from the cell phone seized from the vehicle.

## III.    CONCLUSION AND RECOMMENDATION

In sum, suppression is unwarranted based on the circumstances of the stop. The officers had constitutional bases for their actions and any evidence seized as the result of constitutionally violative conduct would inevitably have been discovered based on an independent and untainted basis.

Accordingly, **IT IS RECOMMENDED** that Defendant Anthony Wynn's Motion to Suppress (R. 34) **be denied**.

This Report and Recommendation is issued pursuant to 28 U.S.C. § 636(b)(1). The parties should consult the statute and Federal Rule of Criminal Procedure 59(b) concerning the right to appeal to the presiding District Judge. Any objection must be filed within **fourteen days** of the entry of this Report and Recommendation. Failure to object per Rule 59(b) waives a party's right to review. Upon expiration of the fourteen-day period, this matter will be submitted to District Judge Bunning for his consideration.

Signed this 25th day of August, 2023.

**Signed By:**

*Candace J. Smith*

**United States Magistrate Judge**

J:\DATA\Orders\criminal cov\2022\22-51-DLB R&R on MTS #34.bw.docx

45